ZEVELY ET AL VS WEIMER ET AL.

Opinion delivered October 19, 1904.

1. *Indian Treaties—Taxes and Royalties—Traders Licenses—Authority to Demand.*

   Under Art. 7, Treaty of 1855, (11 Stat. 612) with Choctaw and Chickasaw nations, securing to said nations the unrestricted right of self-government and full jurisdiction over persons and property within

their respective limits; and under Art. 39, Treaty of 1866 (14 Stat. 95) providing that no person shall expose goods or other articles for sale as a trader without a permit from the legislative authorities of the nation he may propose to trade in, the Choctaw and Chickasaw nations have full authority to require a license fee from all merchants in those nations.

2. *Indian Taxes and Royalties—Right to Levy not Repealed by Atoka Agreement or Act, Cong. 27, 1902.*

The right of the Choctaw and Chickasaw nations to demand license fees from merchants, accorded by Treaties of 1855 and 1866, is not repealed by the Atoka Agreement (Act, June 28, 1898), nor by the Act of May 27, 1902, prohibiting the removal of any person from the Indian Territory when in the lawful possession of lots in any town or city designated as a townsite.

3. *Injunction—Of Acts of Secretary of Interior—When Authorized.*

Before an injunction can issue restraining the Secretary of the Interior or those acting under him, it must appear that he was not authorized to exercise discretion of judgment in the premises; and in enforcing the payment of the licenses authoritatively demanded by the Choctaw & Chickasaw nations, after calling for and receiving an opinion of the Attorney General of the United States he was acting within his authorized discretion.

4. *Rules and Regulations of Interior Department—Courts Take Judicial Notice of.*

The courts will take judicial notice of the rules and regulations of the executive branches of the government.

5. *Injunction—Restraining Exercise of Duties of Executive Departments—Not Allowed.*

It is not within the jurisdiction of courts to enjoin the executive branches of the government in enforcing the terms of a treaty with the Choctaw and Chickasaw nations providing for the collection of a license from traders therein.

Appeal from the United States Court for the Central District.

WILLIAM H. H. CLAYTON, Judge.

Action by W. G. Weimer and others against J. W. Zevely and others for an injunction. Judgment for plaintiffs. Defendants appeal. Reversed.

The plaintiffs below (appellees here) filed their complaint in equity on May 5, 1903, against the defendants below (appellants here), and alleged that they are citizens of the United States, residing and carrying on business within the city of South McAlester; that said city of South McAlester has been duly incorporated, and that plaintiffs, and each of them, are engaged in mercantile business of different kinds in said city; that defendant J. W. Zevely is acting United States Indian inspector; that defendant J. Blair Shoenfelt is United States Indian agent; that defendant I. S. Lowry is in the employ of the Choctaw Nation as a tax, revenue, and royalty collector; that defendants John West, J. F. Wisdom, and D. H. Kelsey are employed by defendants Zevely and Shoenfelt; that defendant Alf McKay is working under the direction and command of aforesaid defendants; that defendant Lowry resides in the Central District, and the other defendants are to be found therein. For cause of complaint, plaintiffs allege that on the ———— day of April, 1903, J. Blair Shoenfelt did notify them that unless they paid the amount of money demanded by the Choctaw Nation by the 30th day of April, 1903, he would forthwith close their places of business, and prevent them from carrying on their business in South McAlester until they should pay the sum demanded by the Choctaw Nation; that it is claimed by the defendants that the said sums of money are due from plaintiffs to the Choctaw Nation for the privilege of doing business in the Choctaw Nation; that defendants are acting together, and are threatening to close the houses of plaintiffs and restrain them from doing business unless said money is paid, and, unless defendants are restrained by the court,

they will proceed to close up plaintiffs' houses; that the tax or debt sought to be collected is 1½ per cent. on all the goods shipped into South McAlester by plaintiffs; that said tax is oppressive and unreasonable, and, if plaintiffs are required to pay same, it will amount practically to confiscation, and drive plaintiffs out of business; that, if the foregoing claim or debt is held to be a tax, it cannot be legally levied against plaintiffs, because the Choctaw Nation has no power to tax the property of a citizen of the United States. Plaintiffs state that their stocks of merchandise range in value from $500 to $75,000, and, if their places of business are closed as threatend, they will be irreparably injured, and allege, unless defendants are restrained by the court, they will close plaintiffs' places of business. Plaintiffs state that the tax or debt sought to be collected is unlawful, and that defendants have no right or authority to collect or demand the same; that the agents of the Interior Department have no right or authority to collect or demand such tax or debt: "(1) Because the Choctaw Nation is no part of the government of the United States; (2) because the Choctaw Nation has provided its own officers or methods of collecting said tax or debt; (3) because the Choctaw Nation still exists as a government, and no authority has been imposed upon the Interior Department or its agents, by express law, to collect such tax or debt." Plaintiffs state that they are not indebted to the Choctaw Nation in any sum, by way of debt or by way of taxes, or by way of license or permit fees. Plaintiffs say that on the 23d day of April, 1897, the Atoka agreement was entered into between the United States and the Choctaw tribe, which was ratified by the Choctaw Nation, and thereafter proclaimed by the President of the United States to be the law; that by said agreement the land within the incorporated city of South McAlester was segregated from the public domain of the Choctaw Nation and set apart as a town site, that the same has been platted, surveyed, appraised, and sold according to the terms of said agreement. That a number

of the plaintiffs are the owners in fee of the lots on which their business houses are located, and are also the owners of the buildings, and that all of plaintiffs are in lawful possession of the lots upon which they are doing business, and have paid all amounts due under said agreement, and are not in default as to any payments upon their business property or upon their houses; that, if the threats of defendants are carried into effect, plaintiffs will suffer great and irreparable injury, and that they have no adequate legal remedy; that defendants are not worth sufficient property out of which plaintiffs can realize the damages that would accrue to them by closing and interfering with their business; that by reason of the foregoing the Choctaw Nation has no power or authority to levy any tax or collect any debt from any citizen situated as plaintiffs are, and defendants ought not to be permitted to close plaintiffs' business houses. Plaintiffs pray for temporary restraining order against defendants from closing the places of business of plaintiffs, and that upon final hearing said restraining order be made perpetual. Notice was served upon defendants that plaintiffs would on May 5, 1903, apply to Hon. W. H. H. Clayton for restraining order, which application for restraining order was on said day granted, upon plaintiffs executing bond to defendants in the sum of $10,000, conditioned as required by law, until the further order of the court. On May 21, 1903, defendant I. S. Lowry filed his answer, stating that he is permit and revenue collector for the Choctaw Nation, and has done no act except to demand the amount due by plaintiffs to him as such collector under the laws of the Choctaw Nation; that he has not attempted and will not attempt to close their stores. And on same day the other defendants filed their demurrer as follows:

"First. Because the bill in equity of the plaintiffs filed in this case does not state facts sufficient to entitle them to the relief prayed for, and because the same states no cause of action.

"Second.    Because the defendants committed the acts complained of in their capacities as officials, as stated in said bill, acting under the authority conferred upon them by law as such officials, and the direct orders of their superiors in office, whom they are bound to obey.    That the defendants, in all of the acts complained of, were lawfully acting within the scope of the authority conferred upon them by law, and in the exercise of the discretion vested in them by their superiors in office, as a coordinate branch of the government, acting within the legitimate scope of its authority.    That said action is in conformity with the long-established construction of the laws of the United States relating to Indian affairs, and the treaties entered into between the United States and the Choctaw or Chickasaw Nations or tribes of Indians.    That, in order that the authority under which defendants have acted may fully appear, the following letters and communications are hereto attached as exhibits, to-wit:

"Marked 'A.'    A letter from the office of the United States Indian inspector to the United States Indian agent, dated April 18, 1903, advising him of the ruling of the honorable Secretary of the Interior that stores should be closed for noncompliance with the tribal laws.

"Marked 'B.'    A letter from the United States Indian inspector to the United States Indian agent, dated April 20, 1903, instructing him to personally notify certain persons and firms reported by the Principal Chief as having failed to pay the tribal tax.

"Marked 'C.'    A letter from the United States Indian inspector to the United States Indian agent, dated May 4, 1903, transmitting report of the Principal Chief of the Choctaw Nation that certain persons and firms named still refused to pay the tax demanded, and instructing him to close the places of business of such persons and companies unless such tax was paid.

"Marked 'D.' A copy of an order of the United States Indian agent, dated May 5, 1903, to the captain of the Indian police, directing him to close the places named.

"Marked 'E.' A copy of the notice served by the United States Indian agent upon all the persons named.

"Third. Because the court has no jurisdiction over the parties and subject-matter of this action.

"Fourth. Because, the premises considered, the court has no jurisdiction or power to control by injunction or otherwise the discretion vested by law in the defendants as a part of the co-ordinate branch of the government, acting within the scope of its authority."

On August 17, 1903, this cause came on for trial, and the following proceedings were had, and order made: "On the 17th day of August, 1903, the same being one of the days of the regular May, 1903, term of this court, this cause came on for trial upon the answer of I. S. Lowry, and the demurrer of the other defendants herein; and the court having heard the arguments of counsel, and being well and fully advised in the premises, no proof having been introduced to sustain the allegations of the complaint against the defendant I. S. Lowry, it is by the court considered, ordered, and decreed that, as to the said defendant I. S. Lowry, this cause be, and the same is hereby, dismissed, and it is further adjudged and decreed that the said defendant recover of the plaintiffs herein all of his costs in this action laid out and expended. It is further by the court considered, adjudged, and decreed that the demurrer of the defendants J. W. Zevely, J. Blair Shoenfelt, John West, Alf. McKay, J. F. Wisdom, and D. H. Kelsey be, and the same is hereby, overruled, with leave to the said defendants to plead further at any time within the next

30 days, to which action of the court in overruling said demurrer defendants except."

On August 31, 1903, the following proceedings were had, and order made: "On this 31st day of August, 1903, the same being one of the days of the regular May, 1903, term of this court, came the plaintiffs herein, and the defendants J. W. Zevely, acting United States Indian inspector, J. Blair Shoenfelt, United States Indian agent, John West, Alf. McKay, J. F. Wisdom, and D. H. Kelsey, by their attorneys; and the said defendants, in open court, declined to plead further in this case, and elected to stand upon their demurrer heretofore filed herein. It is therefore by the court considered, ordered, and decreed that the prayer of the plaintiffs herein against said defendants be granted; that the defendants, their agents, servants, and employes, be, and are hereby, perpetually enjoined and restrained from closing the business houses and from interfering with the business of the said plaintiffs within the city of South McAlester, Indian Territory; and that said defendants, and each of them, their agents, servants, and employes, be, and are hereby, perpetually enjoined and restrained from interfering with the plaintiffs in the conduct of their business within said City of South McAlester. It is further considered, ordered, and decreed that plaintiffs have and recover of said defendants all of their costs in this action laid out and expended, for which let process issue. To the rendering of which decree, defendants in open court excepted, and prayed an appeal to the United States Court of Appeals for the Indian Territory, which said appeal is granted by the court."

*J. H. Wilkins,* U. S. Dist. Atty., Central Dist., *Mansfield, McMurray & Cornish,* and *P. L. Soper,* U. S. Dist. Atty., Northern Dist., for appellants.

*Stuart & Gordon,* for appellees.

TOWNSEND, J.   The appellants have filed two specifications of error, as follows: "(1)   The court erred in overruling the demurrer filed by appellants.   (2)   The court erred in rendering judgment against appellants, perpetually enjoining them from carrying out the orders of the Secretary of the Interior to close the stores of the appellees in the city of South McAlester because of their failure to secure the legislative permit of the nation to expose goods, wares, and merchandise for sale."

To have a clear understanding what relief appellees sought when they asked to enjoin appellant Shoenfelt, we must consider what Shoenfelt proposed to do.   The allegation in their complaint is, that, unless they paid the amount "demanded by the Choctaw Nation for the privilege of doing business in the Choctaw Nation," he would close their stores.   The demand, then, was a demand of the Choctaw Nation for the exercise of the privilege of doing business—simply a license or permit fee.   This is not a tax, in the ordinary acceptation of that term, and can only be so designated in the sense that any exaction by governmental authority might be called a tax; but as applied in this case the term is inaccurate, and to call it a debt is without authority in the decisions of any court.   A license fee is a sum demanded of an individual in return for the grant of a privilege, which he did not previously possess.   A tax, as ordinarily understood, is a contribution demanded by a sovereign from his subjects, as one evidence of their allegiance, in return for his protection.   But these tribal governments are not sovereign in any such a sense. Sovereignty, in its very nature, implies unlimited jurisdiction over persons and property within its territorial limits.   In the very nature and structure of our government, there can be but two sovereignties—the sovereignty of the federal government and that of the states.   Mr. Justice Miller, in the case of United States vs Kagama, 118 U. S. 375, 6 Sup. Ct. 1109, 30 L. Ed. 228, happily expresses this idea: "But these Indians are within the

geographical limits of the United States. The soil and the people within these limits are under the political control of the government of the United States, or of the states of the Union. There exists within the broad domain of sovereignty but these two."

What is, then, the relation of these tribal governments to the government of the United States? It is essential that this relation should be clearly understood, in order that we may correctly apprehend the questions submitted to us upon this appeal. In Cherokee Nation vs Kansas Railway Company, 135 U. S. 653,654, 10 Sup. Ct. 969, 970, 34 L. Ed. 295, Justice Harlan, in delivering the opinion of the court, says: "From the beginning of the government to the present time, they have been treated as 'wards of the nation,' 'in a state of pupilage,' 'dependent political communities,' holding such relations to the general government that they and their country, as declared by Chief Justice Marshall in Cherokee Nation vs Georgia, 5 Pet. 1, 17, 8 L. Ed. 25, 'are considered by foreign nations, as well as by ourselves, as being so completely under the sovereignty and dominion of the United States that any attempt to acquire their lands or to form a political connection with them would be considered by all as an invasion of our territory and an act of hostility.' "

We know, as a matter of history, that the Indians embraced in the different tribes or nations originally occupied the territory now included within the United States and territories. Neither the white man, after his settlements, nor the colonial governments or foreign governments, ever recognized any Indian title, other than that of possession or occupancy of the country. The territory now within the limits of the Choctaw Nation was a part of the Louisiana Purchase, and was ceded to the government of the United States by France in 1803. By treaty of August 24, 1818 (7 Stat. 176), the Quapaw Indians relinquished to the United States their claim to a large tract of country, in-

including the lands of the Choctaw Nation; and by the treaty of June 2, 1825 (7 Stat. 240), the Osages relinquished all their right and title to the land occupied by the Five Civilized Tribes. As the white settlements progressed westward, the occupancy of the land by the different Indian tribes became annoying and burdensome to the white man east of the Mississippi river, and Congress, in its desire to forever settle the Indian question, by an act approved May 28, 1830, 4 U. S. Stat. 411, "provided for an exchange of lands with the Indians residing in any of the states or territories, and for their removal west of the Mississippi river, setting aside the land acquired from the Osages as a permanent reservation for the Indian tribes." Section three of this act authorizes the President to solemnly assure the tribe or nation with which the exchange was made that the United States would forever secure and guarantee to them and their heirs or successors the country so exchanged with them, and, if they preferred, the United States would cause a patent or grant to be made and executed to them for the same, "provided, always, that such lands shall revert to the United States if the Indians become extinct or abandon the same." By treaty made September 27, 1830, proclaimed February 24, 1831 (7 U. S. Stat. 333), it is provided: "The United States under a grant specially to be made by the President of the United States shall cause to be conveyed to the Choctaw Nation a tract of country west of the Mississippi river, in fee simple to them and their descendants, to inure to them while they shall exist as a nation and live on it, beginning near Fort Smith where the Arkansas boundary crosses the Arkansas river, running thence to the source of the Canadian Fork, if in the limits of the United States, or to those limits; thence due south to Red river, and down Red river to the west boundary of the territory of Arkansas, thence north along that line to the beginning. The boundary of the same to be agreeable to the treaty made and concluded at Washington City in the year 1825. The grant to be executed as soon as the present treaty

shall be ratified." In article 4 of said treaty, it was provided: "Art. 4. The government and people of the United States are hereby obliged to secure to the said Choctaw Nation of Red People the jurisdiction and government of all the persons and property that may be within their limits west, so that no territory or state shall ever have a right to pass laws for the government of the Choctaw Nation of Red People and their descendants, and that no part of the land granted them shall ever be embraced in any territory or state; but the United States shall forever secure said Choctaw Nation from, and against, all laws except such as from time to time may be enacted in their own national councils, not inconsistent with the Constitution, treaties and laws of the United States; and except such as may, and which have been; enacted by Congress to the extent that Congress, under the Constitution, are required to exercise a legislation over Indian affairs. But the Choctaws, should this treaty be ratified, express a wish that Congress may grant to the Choctaws the right of punishing by their own laws any white man who shall come into their nation and infringe any of their national regulations." It was provided further in article 10 thereof as follows: "Art. 10. No person shall expose goods or other article for sale as a trader, without a written permit from the constituted authorities of the nation, or authority of the laws of Congress of the United States under penalty of forfeiting the articles, and the constituted authorities of the nation shall grant no license except to such persons as reside in the nation and are answerable to the laws of the nation. The United States shall be particularly obliged to assist to prevent ardent spirits from being introduced into the nation." Under this latter treaty a patent was issued to the Choctaw Nation on the 23d day of March, 1842, conveying a tract of land, the boundaries of which were the same as contained in said treaty of 1830. By a treaty proclaimed March 24, 1837, the Choctaw Nation granted to the Chickasaw Nation the privilege of forming

43

a district within the limits of their country. See Revision of Indian Treaties, p, 1046. Article 7 of the treaty of 1855 (Revision of Indian Treaties, p. 277) provided: "Art. 7. So far as may be compatible with the Constitution of the United States and the laws made in pursuance thereof, regulating trade and intercourse with the Indian tribes, the Choctaws and Chickasaws shall be secured in the unrestricted right of self-government, and full jurisdiction over persons and property within their respective limits, excepting, however, all persons, with their property, who are not, by birth, adoption or otherwise citizens or members of either the Choctaw or Chickasaw tribe; and all persons, not being citizens or members of either tribe, found within their limits, shall be considered intruders, and be removed from and kept out of the same by the United States agent, assisted, if necessary, by the military, with the following exceptions, viz.: Such individuals as are now, or may be, in the employment of the government, and their families; those peacefully traveling or temporarily sojourning in the country or trading therein, under license from the proper authority of the United States, and such as may be permitted by the Choctaws or Chickasaws, with the assent of the United States agent, to reside within their limits, without becoming citizens or members of either of said tribes." 11 Stat. 612. In 1866 the United States made a treaty with the Choctaws and Chickasaws (Revision of Indian Treaties, pp. 285-303) which contains, among others, the following articles: In article 7 it is provided: "Art. 7. The Choctaws and Chickasaws agree to such legislation as Congress and the President of the United States may deem necessary for the better administration of justice and the protection of the rights of person and property within the Indian Territory. Provided, however, such legislation shall not in any wise interfere with or annul their present tribal organization, or their respective legislatures or judiciaries, or the rights, laws, privileges or customs of the Choctaw and Chickasaw Nations respectively." In paragraph 8 of article 8 it is provided:

"(8)   The Choctaws and Chickasaws also agree that a court or courts may be established in said territory with such jurisdiction and organization as Congress may prescribe.   Provided, that the same shall not interfere with the local judiciary of either of said nations."   By article 10 it was provided:   "Art. 10.   The United States reaffirms all obligations arising out of treaty stipulations or acts of legislation with regard to the Choctaw and Chickasaw Nations, entered into prior to the late Rebellion, and in force at that time, not inconsistent herewith; and further agrees to renew the payment of all annuities and other moneys accruing under such treaty stipulations and acts of legislation, from and after the close of the fiscal year ending on the thirtieth of June, in the year eighteen hundred and sixty-six."   In article 39 it was provided:   "Art. 39.   No person shall expose goods or other articles for sale as a trader without a permit of the legislative authorities of the nation he may propose to trade in, but no license shall be required to authorize any member of the Choctaw or Chickasaw Nations to trade in the Choctaw or Chickasaw country who is authorized by the proper authority of the nation, nor to authorize Choctaws or Chickasaws to sell flour, meal, meat, fruit and other provisions, stock, wagons, agricultural implements or tools brought from the United States into the said country."   In article 45 it was provided:   "Art. 45.   All the rights, privileges and immunities heretofore possessed by said nations or individuals thereof, or to which they were entitled under the treaties and legislation heretofore made and had in connection with them shall be, and are hereby declared to be, in full force, so far as they are consistent with the provisions of this treaty."   14 Stat. 87, 88, 90, 95.

It will thus be seen that the Choctaw Nation is not holding its territory by simple occupancy, but by a patent conveying and describing by metes and bounds the territory conveyed to it by the United States government.   Its relations to the government

of the United States—and the same applies to the Five Civilized Tribes—are sui generis among Indian reservations. It also appears by article 7, treaty of 1855, that, so far as compatible with the Constitution and laws regulating trade and intercourse, the Choctaws and Chickasaws shall be secured in the unrestricted right of self-government, and full jurisdiction over persons and property "within their respective limits," excepting noncitizens, who shall be considered intruders, and be removed, with the exception of those "trading therein under license from the proper authority of the United States." And by treaty between the United States and the Choctaws and Chickasaws of 1866, art. 39, it is provided: "Art. 39. No person shall expose goods or other articles for sale as a trader without a permit of the legislative authorities of the nation he may propose to trade in."

It thus clearly appears by the treaty of 1855 that the Choctaws and Chickasaws shall be secured in the unrestricted right of self-government, and full jurisdiction—where? "Within their respective limits." They are not to have jurisdiction over noncitizens and their property "found within their limits," and such shall be considered intruders and be removed, but an exception to those to be removed are those "trading" therein under license from the United States;" and by the treaty of 1866, art. 39. "No person shall expose goods for sale as a trader without a permit of the legislative authorities of the nation he proposes to trade in;" the treaty of 1855 being thus modified by the later treaty of 1866 so that the license shall be granted by the legislative authorities of the nation, instead of by the government of the United States. By the express terms of the treaties, the only persons to be removed are the non-citizens "found within their limits," but "traders" are not to expose goods for sale without a permit from the legislative authorities, and are expressly excepted from those to be removed. The appellees, by their own complaint, admit that they are traders "without license from the

legislative authorities of the nation they propose to trade in." By article 45 of the treaty of 1866 it is provided: "Art. 45. All the rights, privileges and immunities heretofore possessed by said nations or individuals thereof, or to which they were entitled under the treaties and legislation heretofore made and had in connection with them shall be, and are hereby declared to be, in full force, so far as they are consistent with the provisions of this treaty." It seems, therefore, quite unnecessary to enter the field of speculation or explore the realms of imagination to discover by what authority the tribal governments of the Choctaws and Chickasaws fix a license fee for traders, or to investigate for precedents for such action, when by express terms it is under and by virtue of the power conferred by the aforesaid treaties with the government of the United States.

As has heretofore shown, these Indian tribes are not sovereign. The United States government is their sovereign, and, when the Constitution of the United States gave to Congress the power "to regulate commerce with foreign nations and among the several states and with the Indian tribes," it placed the whole subject of intercourse with Indians in the hands of Congress. The courts on numerous occasions have spoken of them as domestic dependent nations, as wards of the government of the United States, and of the government as the guardian of these Indian tribes and people. We must therefore look to the treaties, agreements, and acts of Congress to determine the power of these limited Indian governments, and also to learn what obligations the government of the United States has imposed upon itself in its care and supervision of its Indian wards. By the treaty of 1855 the United States obligates itself to secure to the Choctaws and Chickasaws the unrestricted right of self-government "within their respective limits," and by the treaty of 1866 it obligates itself to see that "no person shall expose goods for sale without a permit." Are these provisions of those treaties still in force?

They are unless repealed. Do they need interpretation? If so, how shall they be interpreted? In United States vs Choctaw, etc., Nations, 179 U. S. 531, 532, 21 Sup. Ct. 163, 164, 45 L. Ed. 291, Justice Harlan said: "There was much discussion at the bar as to the principles that should govern the court when determining the scope and effect of a treaty between the United States and Indian tribes. All agree that, as a general rule, in the interpretation of written instruments the intention of the parties must control, and that such intention is to be gathered from the words used; the words being interpreted, not literally nor loosely, but according to their ordinary signification. If the words be clear and explicit, leaving no room to doubt what the parties intended, they must be interpreted according to their natural and ordinary significance. If the words are ambiguous, then resort may be had to such evidence, written or oral, as will disclose the circumstances attending the execution of the instrument, and place the court in the situation in which the parties stood when they signed the writing to be interpreted. To what extent, if at all, have these rules been enlarged or modified when the instrument to be interpreted is a treaty between the United States and Indian tribes? In The Kansas Indians, 5 Wall. 737, 760, 18 L. Ed. 667, it was said that enlarged rules of construction have been adopted in reference to Indian treaties, citing as the words of Chief Justice Marshall in Worcester vs Georgia, 6 Pet. 515, 563, 582, 8 L. Ed. 483, but which were in fact the words of Mr. Justice McLean in his concurring opinion in that case, the following: 'The language used in treaties with the Indians should never be construed to their prejudice. If words be made use of which are susceptible of a more extended meaning than their plain import, as connected with the tenor of the treaty, they should be considered as used only in the latter sense.' Mr. Justice McLean further said: 'How the words of the treaty were understood by this unlettered people, rather than their critical meaning, should form the rule of construction ' In United States vs Kagama, 118

U. S. 375, 383, 384, 16 Sup. Ct. 1109, 30 L. Ed. 228, the Indian
tribes in this country are spoken of as wards of the nation—com-
munities dependent for their food and their political rights, as
well as for protection, on the United States. And in Choctaw
Nation vs United States, 119 U. S. 1, 28, 7 Sup. Ct. 75, 30 L. Ed.
306, it was said that the relation between the United States and
the Indian tribes was that of superior and inferior, and that the
rules to be applied in the case then before the court were those
that govern public treaties, which, even in case of controversies
between nations equally independent, were not to be interpreted
as rigidly as documents between private persons governed by a
system of technical law, 'but in the light of the larger reason and
the superior justice that constitute the spirit of the law of na-
tions.' In Jones vs Meehan, 175 U. S. 1, 11, 20 Sup. Ct. 1, 44 L.
Ed. 49, it was said that a treaty between the United States and
an Indian tribe must be construed, not according to the technical
meaning of its words to learned lawyers, but in the sense in which
they would naturally be understood by the Indians." If they
shall not expose goods for sale without a permit, what remedy
could be more direct and certain than to close their stores? And
is the government of the United States still under obligations to
carry out those provisions?

It is expressly agreed by the learned counsel for the
appellees that this license fee was a legal imposition, but they say,
when Congress and the Choctaws and Chickasaws entered into
the Atoka agreement, that, by the provisions thereof segregating
the land within the boundaries of the respective municipalities,
they by implication repealed the provision of article 39 of the
treaty of 1866. It is not claimed that there was any express
repeal. By the treaty of September 27, 1830, art. 2 (7 Stat. 333),
it is provided that "the United States, under a grant specially to
be made by the President of the United States, shall cause to be
conveyed to the Choctaw Nation a tract of country west of the

Mississippi river, in fee simple to them and their descendants, to inure to them while they shall exist as a nation and live on it;" then describing the boundaries of the grant. And by the treaty of 1855 (11 Stat. 612) it is provided: "Art. 7. So far as may be compatible with the Constitution of the United States and the laws made in pursuance thereof, regulating trade and intercourse with the Indian tribes, the Choctaws and Chickasaws shall be secured in the unrestricted right of self-government, and full jurisdiction over persons and property within their respective limits." The language is not that the Indian nations shall be secured in their jurisdiction over persons upon lands "belonging to the tribe," or "which the tribe is entitled to occupy," but they express clearly and unmistakably that the authority of each nation shall be exercised throughout the entire territorial domain, the boundaries of which are set forth in that same instrument.

Repeals by implication are not favored, and the rule has frequently been declared, when a repeal of a former statute is sought by the enactment of a subsequent statute to work such repeal or annulment, the repugnancy between the one and the other in relation to a particular subject matter must be so clear as to admit of no other reasonable construction. In 9 Op. Attys. Gen. p. 47, it is said: "It is so easy for the Legislature, in making one law, to say that another law on the same subject is repealed, and when it is meant it is so likely to be said, that we never presume it when it is not said, unless the two laws are in such palpable conflict that both cannot be executed. When different statutes give to different persons privileges or powers which cannot subsist together, the latter grant must of necessity be construed as a withdrawal of the earlier one. But in order to justify such a construction, it must appear to be a case of flat repugnancy or of irreconcilable inconsistency." In Ex parte Crow Dog, 109 U. S. 570, 3 Sup. Ct. 405, 27 L. Ed. 1030, Justice Matthews says: "Implied repeals are not favored. The implication must be

necessary. There must be a positive repugnancy between the provisions of the new laws and those of the old. Wood vs United States, 16 Pet. 342, 10 L. Ed. 987; Daviess vs Fairbairn, 3 How. 636, 11 L. Ed. 760; United States vs Tynen, 11 Wall. 88, 20 L. Ed. 153; State vs Stoll, 17 Wall. 425, 21 L. Ed. 650."

The Attorney General of the United States, on this question, in his letter advising the Secretary of the Interior, under date of September 7, 1900, says: "But however this may be, and even if the Indian title to the particular lots sold has been extinguished, and conceding that the statute authorizes the purchase of such lots by an outsider, and recognizes his right to do so, the result is the same, for the legal right to purchase lands within an Indian nation gives the purchaser no right of exemption from the laws of such nation, nor does it authorize him to do any act in violation of the treaties with such nation. These laws requiring a permit to reside or carry on a business in the Indian country existed long before and at the time this act was passed. And if an outsider saw proper to purchase a town lot under this act of Congress, he did so with the full knowledge that he could occupy it for a residence or business only by permission from the Indians. I do not say that Congress might not violate its treaty promises, and authorize the outside world to enter upon and occupy the lands of the Indians without their consent, but do say that provisions very different from any contained in this act would be required to justify the imputation of any such intention. All that this act does in this respect is to give the consent of the United States to such purchase, with the assumption that the purchaser, if he wishes to occupy, will comply with the local laws just as in other cases. The United States might sell land which it holds in a state, but it would be a strange contention that this gave the purchaser any immunity from local laws or taxation. The case is much like that of a federal license to manufacture and sell spirituous liquors, which, while good against the United

States, confers no right where such sale and manufacture are forbidden. This act was passed with a full knowledge of these laws of the Indian Nation, approved by the President, and having the full force of laws; and, had Congress intended to nullify these laws, or take away the power to enact them, or to exempt the purchaser of lots or any other persons from their operation, it is quite safe to say that it would have done so by provisions very different from those in the act of 1898."

By the treaty of 1830, heretofore quoted, the tract of country conveyed to the Choctaws is "to inure to them while they shall exist as a nation and live on it," and by treaty of 1855 they are to have unrestricted right of self-government "within their respective limits." The lots in the different municipalities segregated under the Atoka agreement were not sold to non-citizens alone, but to Indians as well. By the same agreement it is provided: "In view of the modification of legislative authorities and judicial jurisdiction herein provided, and the necessity of the continuance of the tribal governments so modified, in order to carry out the requirements of this agreement, that the same shall continue for the period of eight years from the fourth day of March, eighteen hundred and ninety-eight. This stipulation is made in the belief that the tribal government so modified will prove so satisfactory that there will be no need or desire for further change till the lands now occupied by the Five Civilized Tribes shall, in the opinion of Congress, be prepared for admission as a state of the Union. But this provision shall not be construed to be in any respect an abdication by Congress of power at any time to make needful rules and regulations respecting said tribes." It is thus expressly provided that these tribal governments shall continue for a period of eight years from the 4th day of March, 1898, and until they expire they certainly exist as a nation, and have unrestricted jurisdiction "within their respective limits." Why? Because Congress has said so.

There is no repugnancy between the former treaties and the Atoka agreement. By act of Congress approved May 27, 1902 (chapter 888, 32 Stat. 259), the Secretary of the Interior was forbidden to remove any person from the Indian Territory "who is in lawful possession of any lots or parcels of land in any town or city of the Indian Territory which has been designated as a town site under existing laws and treaties."

By the foregoing repeal of the authority to remove intruders, counsel for appellees contend that no penalty is left to the Choctaw Nation to prohibit traders from exposing goods for sale without license. It is persistently assumed that intruders and traders who expose goods for sale without license refer to the same class of people, and that the repeal of the penalty against the enforcement of the quasi penal statute against intruders repeals the statute which prohibits traders to expose goods for sale without license. No authority is cited, and the contention has heretofore been shown to be incorrect.

When Congress found the Indian question was not settled, and it had no more reservations to which to remove the Indians, it appears to have arrived at the conclusion to allot the lands in severalty, establish municipal governments in thickly settled portions of the territory, and, so far as possible consistent with its sacred obligations as guardian for innocent wards, to comply with the wishes of the clamorous white settlers of the Indian Territory to be placed in possession of the earth and the fullness thereof. Having sold the lots in the town sites under the provisions of the Atoka agreement, it acted justly when it repealed the authority to remove intruders who had purchased any of those lots. But nowhere and at no time has Congress said that persons desiring "to expose goods for sale" shall not pay a license fee as provided in the treaty of 1866, and courts of justice, when called upon by traders who confess to be violating the laws,

should not assume a jurisdiction committed by Congress to the executive department of the government, and should not seek to destroy the governments of these nations by taking away their revenue, when Congress had provided for their continued existence.

Before an injunction can issue restraining the Secretary of the Interior, or those acting under him, it must appear that he was not authorized to exercise discretion of judgment in the premises. How can this be said? In this very case the Secretary of the Interior, as was his duty, called upon the Attorney General of the United States for an opinion, which was rendered, and under which he was proceeding to act. Can it be said that action taken under these circumstances is not that calling for the exercise of the highest judgment and discretion? It is certainly true that, if such action can be taken, it can only be done upon some principle not heretofore announced, and will constitute a departure involving the gravest consequences. If this can be done, then the executive department of the government can, on the varied matters committed to its care in the Indian Territory, only act under the direction of the United States Courts established within this jurisdiction.

The absolute power and dominion of the United States in the exercise of its political and administrative power in dealing with Indians and Indian property is illustrated and asserted in numerous decisions. We cite Cherokee Nation vs Georgia, 5 Pet. 1, 8 L. Ed. 25; Johnson vs McIntosh, 8 Pet. 543, 5 L. Ed. 681; United States vs Kagama, 118 U. S. 375, 6 Sup. Ct. 1109, 30 L. Ed. 228; Choctaw Nation vs United States, 119 U. S. 1, 7 Sup. Ct. 75, 30 L. Ed. 306; Cherokee Nation vs Southern Kansas Railway Co., 135 U. S. 641, 10 Sup. Ct. 965, 34 L. Ed. 295; Stephens vs Cherokee Nation, 174 U. S. 445, 19 Sup. Ct. 722, 43 L. Ed. 1041. In Lone Wolf vs Hitchcock, 187 U. S. 553, 23 Sup. Ct. 216,

47 L. Ed. 299, the contention was made that under and by virtue of article 12 of a certain treaty the Indians were vested with an interest in lands, and that that interest could not be divested, except in accordance with the provisions of said treaty; and Justice White, in his opinion, says: "The contention in effect ignores the status of the contracting Indians, and the relation of dependency they bore and continue to bear towards the government of the United States. To uphold the claim would be to adjudge that the indirect operation of the treaty was to materially limit and qualify the controlling authority of Congress in respect to the care and protection of the Indians, and to deprive Congress, in a possible emergency, when the necessity might be urgent for a partition and disposal of the tribal lands, of all power to act if the assent of the Indians could not be obtained. * * * Plenary authority over the tribal relations of the Indians has been exercised by Congress from the beginning, and the power has always been deemed a political one, not subject to be controlled by the judicial department of the government. * * * In any event, as Congress possessed full power in the matter, the judiciary cannot question or inquire into the motives which prompted the enactment of this legislation. If injury was occasioned—which we do not wish to be understood as implying— by the use made by Congress of its power, relief must be sought by an appeal to that body for redress, and not to the courts." In the case of Cherokee Nation vs Hitchcock, 187 U. S. 294, 23 Sup. Ct. 115, 47 L. Ed. 183, the court says: "We are not concerned in this case with the question whether the act of June 28, 1898, and the proposed action thereunder, which is complained of, is or is not wise and calculated to operate beneficially to the interests of the Cherokees. The power existing in Congress to administer upon and guard the tribal property, and the power being political and administrative in its nature, the manner of its exercise is a question within the province of the legislative branch to determine, and is not one for the courts." In Pilgrim vs Beck

(C. C.) 69 Fed. 898, Judge Shiras says: "The management and control of these lands for the benefit of the Indian is in the hands of the Department of the Interior, and it is for the officials of that department to give weight to any equities or considerations of hardships that may exist in favor of any of the complainants herein. The Indian agent, acting under the instructions of the department, is charged with the duty of protecting the interests of the Indians, and it is not for the court to interfere with his action on the ground of hardship to the complainants." The President, by express statute, is directed to protect these Indians. Section 2114, Rev. St. U. S., is as follows: "The President is authorized to exercise general superintendence and care over any Indian tribe or nation which was removed upon an exchange of territory under authority of the act of May twenty-eighth, eighteen hundred and thirty, 'to provide for an exchange of lands with the Indians residing in any of the states or territories and for their removal west of the Mississippi,' and to cause such tribe or nation to be protected, at their new residence, against all interruption or disturbance from any other tribe or nation of Indians, or from any other person or persons whatever." Under section 2058, Rev. St. U. S., the Indian agent is directed to superintend the intercourse with Indians, agreeably to law, and execute and perform such regulations and duties, not inconsistent with law, as may be prescribed by the President, the Secretary of the Interior, the Commissioner of Indian Affairs, or the Superintendent of Indian Affairs.

The courts will take judicial knowledge of the rules and regulations of the executive of the government. See Caha vs United States, 152 U. S. 221, 14 Sup. Ct. 517, 38 L. Ed. 415. In this case Justice Brewer says: "It may be laid down as a general rule deducible from the cases that wherever, by the express language of any act of Congress, power is intrusted to either of the principal departments of government to prescribe rules and

regulations for the transaction of business in which the public is interested, and in respect to which they have a right to participate, and by which they are to be controlled, the rules and regulations prescribed in pursuance of such authority become a mass of that body of public records of which the courts take judicial notice." Under the provisions of section 2058, Rev. St. U. S., the Secretary of the Interior promulgated the following rule: "Sec. 558. Agents are enjoined to observe with care the laws, and the rules and regulations thereunder, governing the business of all licensed traders, and to see that they are strictly complied with. If the persons carry on trade within a reservation with the Indians, without a license, or if persons who have received license and neglecting to renew the same, continue to trade after the expiration of the license, agents will close the stores of such traders, and immediately report the facts to the Indian Office, in order that legal steps may be taken to enforce the penalties of the law. Violations of the foregoing regulations in other respects must also be at once reported to the Indian Office by the agent in charge of the reservation where the violations occur." The regulations under which appellants in this case are acting set forth in the exhibits to the demurrer.

In Re Neagle, 135 U. S. 1, 10 Sup. Ct. 658, 34 L. Ed. 55, Justice Miller, discussing the powers of the executive departments of the government, says: "In the view we take of the Constitution of the United States, any obligation fairly and properly inferable from that instrument, or any duty of the marshal to be derived from the general scope of his duties under the laws of the United States, is 'a law,' within the meaning of this phrase. It would be a great reproach to the system of government of the United States, declared to be within its sphere sovereign and supreme, if there is to be found within the domain of its powers no means of protecting the judges, in the conscientious and faithful discharge of their duties, from the malice and

hatred of those upon whom their judgments may operate un-
favorably. * * * Here, again, we are met with the theory
that the government of the United States does not rest upon the
soil and territory of the country. We think that this theory is
founded on an entire misconception of the nature and powers of
that government. We hold it to be an incontrovertible principle
that the government of the United States may, by means of
physical force exercised through its official agents, execute on
every foot of American soil the powers and functions that belong
to it. This necessarily involves the power to command obedience
to its laws, and hence the power to keep the peace to that extent.
This power to enforce its laws and to execute its functions in all
places does not derogate from the power of the state to execute
its laws at the same time and in the same places. The one does
not exclude the other, except where both cannot be executed at
the same time. In that case the words of the Constitution itself
show which is to yield. 'This Constitution, and all laws which
shall be made in pursuance thereof, * * * shall be the
supreme law of the land.' * * * Without the con-current
sovereignty referred to, the national government would be noth-
ing but an advisory government. Its executive power would be
absolutely nullified. Why do we have marshals at all, if they
cannot physically lay their hands on persons and things in the
performance of their proper duties? What functions can they
perform, if they cannot use force? In executing the processes of
the courts, must they call on the nearest constable for protection?
Must they rely on him to use the requisite compulsion, and to
keep the peace, whilst they are soliciting and entreating the
parties and bystanders to allow the law to take its course? This
is the necessary consequence of the positions that are assumed.
If we indulge in such impracticable views as these, and keep on
refining and re-refining, we shall drive the national government
out of the United States, and relegate it to the District of Col-
umbia, or perhaps to some foreign soil. We shall bring it back

to a condition of greater helplessness than that of the old confederation. * * * It must execute its powers, or it is no government. It must execute them on the land as well as on the sea, on things as well as on persons. And to do this it must necessarily have power to command obedience, preserve order, and keep the peace; and no person or power in this land has the right to resist or question its authority, so long as it keeps within the bounds of its jurisdiction. * * * Const. § 3, art. 2, declares that the President 'shall take care that the laws be faithfully executed,' and he is provided with the means of fulfilling this obligation by his authority to commission all the officers of the United States, and, by and with the advice and consent of the Senate, to appoint the most important of them, and to fill vacancies. He is declared to be commander in chief of the army and navy of the United States. The duties which are thus imposed upon him he is further enabled to perform by the recognition in the Constitution, and the creation by acts of Congress, of executive departments, which have varied in number from four or five to seven or eight, the heads of which are familiarly called 'cabinet ministers.' These aid him in the performance of the great duties of his office, and represent him in a thousand acts to which it can hardly be supposed his personal attention is called; and thus he is enabled to fulfill the duty of his great department, expressed in the phrase that 'he shall take care that the laws be faithfully executed.' Is this duty limited to the enforcement of acts of Congress or of treaties of the United States according to their express terms, or does it include the rights, duties, and obligations growing out of the Constitution itself, our international relations, and all the protection implied by the nature of the government under the Constitution?" Can there be any question that the power to enforce the terms of the treaty, that "no person shall expose goods for sale without a permit," is a duty imposed upon the executive department of the government?

And when in the discharge of that duty, it is not within the jurisdiction of the courts to enjoin such action.

That the order of the Department of the Interior in this matter is a legal writ of process, and not in violation of article 5 of the amendments to the Constitution of the United States, see United States vs Mullin (D. C.) 71 Fed. 682. This authorized the action of the appellants.

The treaty of 1866 says no person shall expose goods for sale without a permit, and counsel for appellees say: "But the penalty has been repealed, and that repeals the statute. Therefore the President is powerless to do anything." This does not seem to coincide with the views of Atty. Gen. Black upon that condition of things. In 9 Op. Attys. Gen., 519, Atty. Gen. J. S. Black says: "The acts of Congress sometimes give the President a broad discretion in the use of the means by which they are to be executed, and sometimes limit his power so that he can exercise it only in a certain prescribed manner. Where the law directs a thing to be done without saying how, that implies the power to use such means as may be necessary and proper to accomplish the end of the Legislature. But where the mode of performing a duty is pointed out by statute, that is the exclusive mode, and no other can be followed. The United States have no common law to fall back upon when the written law is defective. If, therefore, an act of Congress declares that a certain thing shall be done by a particular officer, it cannot be done by a different officer. The agency which the law furnishes for its own execution must be used to the exclusion of all others." In 19 Op. Attys. Gen. p. 515, Atty. Gen. Miller, in discussing the powers of the Postmaster General, says: "Power to establish post offices and postroads is conferred upon Congress, but the policy of the government from the time the general post office was established has been to delegate the power to designate the places where the

mails shall be received and delivered to the Postmaster General Having found that the powers of the Postmaster General to. establish post offices was justified by usage and the policy of the Government from its foundation, the court held that the power to discontinue post offices was incident to the power to establish them, and that therefore the discontinuance of the post office by the Postmaster General was legal, notwithstanding the fact that a postmaster had been appointed by the President, by and with the advice and consent of the Senate, for a term of four years, which had not expired at the time of the discontinuance of the post office." We think the rule laid down in Beck vs Flournoy L. S. & R. E. Co., 65 Fed. 38, 12 C. C. A. 505, is applicable to this case. It is as follows:

"It is not within the legitimate province of a court of equity to assist a wrongdoer, like the appellee, in retaining the possession of property which it has acquired in open violation of an act of Congress, when the party against whom relief is sought is an officer of the United States who is acting under the direction and control of the Secretary of the Interior."

We are of the opinion, after a careful examination of the record and briefs filed in this case, that the judgment of the court below should be reversed, the demurrer sustained, and the complaint dismissed by this court, and it is so ordered.

RAYMOND, C. J., concurs.

GILL, J., concurs in the judgment of the court in reversing the lower court, but does not assent to either the reasons assigned in the opinion for the reversal, nor certain conclusions reached therein by the court, and assigns his reasons as follows:

A complete statement of the case is found in the opinion of the court preceding, and I will but summarize. Appellees are

named plaintiffs in the complaint as W. G. Weimer, S. G. Holmes, Townsend Wholesale Grocery Company, a corporation, Arcade Dry Goods Company, a corporation, Herman Levin, Stewart & Nichols, a partnership, the P. A. Vance Grocery Company, a corporation, the Chaney-Becker Trading Company, a corporation, Ben Durfee & Co., a partnership, Star Grocery Company, a partnership, Armour Packing Company, a corporation, Cudahy Packing Company, a corporation, Swift & Co., a corporation, Hammond Packing Company, a corporation, who bring this suit on behalf of themselves, and other citizens similarly situated, who are very numerous, and complain against defendants appellants, J. W. Zevely, Acting United States Indian inspector, J. Blair Shoenfelt, United States Indian agent, Union Agency, I. S. Lowry, Alf. McKay, J. F. Wisdom, D. F. Kelsey, and John West.

Plaintiffs allege that they are citizens of the United States residing and carrying on business in the city of South McAlester; that said city is duly incorporated as permitted by law; that plaintiffs, and each of them, are engaged in mercantile business in said city of different kinds, carrying stocks of merchandise ranging in value from $500 to $75,000; that a number of plaintiffs are the owners in fee of the lots of ground on which their business houses are located within said city, and own the buildings in which they are doing business, and that all of plaintiffs are in lawful possession of the lots upon which they are doing business; that they have made all payments thereon required by law, and are not in default of anything by law required of them, but are ready and willing and intend to pay the amounts which shall become due under the Atoka agreement; that on April 23, 1897, the Atoka agreement was entered into between the Choctaw and Chickasaw Nations and the United States, by the provisions of which lands within said city were segregated from the public domain of the Choctaw Nation and set apart as a town site; that

the same has been platted, surveyed, appraised, and sold under the direction of the United States and Choctaw Nation according to the terms of said Atoka agreement; that all of the land within the said town site has been sold and disposed of according to the terms of said Atoka agreement, which provides that the owners of improvements upon lots shall have the right to buy one residence lot and one business lot in said town site and in other towns in Choctaw Nation at 50 per cent. of the appraised value of such improvements, and the remainder of improved property at $62\frac{1}{2}$ per cent. of the appraised value of the same, within 60 days from the date of notice served upon him that such lot is for sale, and, if he purchases the same, he shall within 10 days of such purchase pay into the treasury of the United States one-fourth of the purchase price, and the balance in three equal annual installments, and when the entire sum shall be paid he shall be entitled to a patent for the same; that in April, 1903, J. Blair Shoenfelt, as Indian agent, did notify plaintiffs that unless they paid the amount of money demanded by the Choctaw Nation by April 30, 1903, he, the said Indian agent, would forthwith close their places of business, and prevent them from carrying on their said business in said city until they should pay the sum demanded; that said sum demanded by said nation of plaintiffs is $1\frac{1}{2}$ per cent. on all goods shipped into said city by plaintiffs, and is claimed to be due said nation from plaintiffs for the privilege of doing business in the Choctaw Nation; that defendants are acting together, and are threatening to and about to close the several houses of plaintiffs and prevent them from carrying on their business unless said sums of money demanded shall be paid; that said sums, if paid by plaintiffs, will amount practically to confiscation; and that plaintiffs will be unable to pay said sums and continue their business. Plaintiffs state that they are not indebted to the Choctaw Nation in any sum of money, by way of debt or taxes or permit or license fees; that defendants have no right or authority to collect or demand said sums from plaintiffs; that the damage to plaintiffs

will be irreparable, if their places of business shall be closed, and plaintiffs are without adequate legal remedy; that defendants are not worth sufficient property out of which plaintiffs can recover the damages resulting to them from the acts of defendants in closing their houses and interfering with their business—and praying for a temporary restraining order against defendants. Defendant Lowry answered, and bill dismissed as to him. All other defendants demur to bill of complaint generally and specially. Demurrer overruled. Exception taken. Defendants stand on demurrer, refuse to plead further, and injunction ordered. Defendants except, and pray and are allowed an appeal.

Appellants make the following assignments of error:

"(1)   The court erred in overruling the demurrer filed by appellants.   (2)   The court erred in rendering judgment against appellants perpetually enjoining them from carrying out the orders of the Secretary of the Interior to close the stores of the appellees in the city of South McAlester because of their failure to secure the legislative permit of the nation to expose goods, wares, and merchandise for sale."

Appellants, in the first assignment of error, say the court erred in overruling the demurrer to the complaint.   The demurrer is as follows:

"Come now the defendants, J. W. Zevely, Acting United States Indian inspector, J. Blair Shoenfelt, United States Indian agent, Union Agency, John West, Alf McKay, J. F. Wisdom, and demur to the complaint of the plaintiffs, and for ground therefor state:

"First.   Because the bill in equity of the plaintiffs filed in this case does not state facts sufficient to entitle them to the

relief prayed for, and because the same states no cause of action.

"Second.   Because the defendants committed the acts complained of in their capacities as officials, as stated in said bill, acting under the authority conferred upon them by law as such officials, and the direct orders of their superiors in office, whom they are bound to obey.   That the defendants, in all of the acts complained of, were lawfully acting within the scope of the authority conferred upon them by law, and in the exercise of the discretion vested in them by their superiors in office, as a co-ordinate branch of the government, acting within the legitimate scope of its authority.   That said action is in conformity with the long-established construction of the laws of the United States relating to Indian affairs, and the treaties entered into between the United States and the Choctaw or Chickasaw Nations or tribes of Indians.   That, in order that the authority under which defendants have acted may fully appear, the following letters and communications are hereto attached as exhibits, to wit:

"Marked 'A.'   A letter from the office of the United States Indian inspector to the United States Indian agent, dated April 18, 1903, advising him of the ruling of the honorable Secretary of the Interior that stores should be closed for noncompliance with the tribal laws.

"Marked 'B.'   A letter from the United States Indian inspector to the United States Indian agent dated April 20, 1903, instructing him to personally notify certain persons and firms reported by the Principal Chief as having failed to pay the tribal tax.

"Marked 'C.'   A letter from the United States Indian inspector to the United States Indian agent dated May 4, 1903, transmitting report of the Principal Chief of the Choctaw Nation

that certain persons and firms named still refused to pay the tax demanded, and instructing him to close the places of business of such persons and companies unless such tax was paid.

"Marked 'D.' A copy of an order of the United States Indian agent dated May 5, 1903, to the captain of the Indian police, directing him to close the places named.

"Marked 'E.' A copy of the notice served by the United States Indian agent upon all persons named.

"Third. Because the court has no jurisdiction over the parties and subject-matter of this action.

"Fourth. Because, the premises considered, the court has no jurisdiction of power to control by injunction or otherwise the discretion vested by law in the defendants as a part of a co-ordinate branch of the government, acting within the scope of its authority."

If, for any of the four reasons assigned as grounds for demurrer, the court erred in overruling it, the case must be reversed for such error.

Section 5028, Mansf. Dig. (Ind. Ter. St. 1899, § 3233), defines a demurrer: "Sec. 5028. The defendant may demur to the complaint where it appears on its face, either, first, that the court has no jurisdiction of the person of the defendant or the subject-matter of the action; or, second, that the plaintiff has not legal authority to sue; or, third, that there is another action pending between the same parties for the same cause; or fourth, that there is a defect of parties plaintiff or defendant; or, fifth, that the complaint does not state facts sufficient to constitute a cause of action."

"Sec. 5031. When any of the matters enumerated in Sec. 5028 do not appear on the face of the complaint the objection may be taken by answer." Ind. Ter. St. 1899, § 3236.

An examination of the second and fourth grounds of demurrer in this case shows that they do not come within the office of a demurrer at all, but the facts stated therein and the exhibits referred to therein might properly be matters of defense if stated in an answer.

By this demurrer we are driven only to examine the face of the complaint in two respects: First, does it state a cause of action? And, second, did the court have jurisdiction over the parties and subject-matter of the action? These are the only matters properly before this court for consideration.

The demurrer admits all the facts well pleaded in the complaint as true, and on its face I must say that under the law the court has jurisdiction of both subject-matter and parties. But does this complaint state facts sufficient to constitute a cause for action?

That part of the Atoka agreement referred to in the complaint and pertinent is as follows: "It is further agreed that there shall be appointed a commission for each of the two nations," who "shall lay out town sites," who "shall have prepared plats" to be "filed" and "approved" before same "shall take effect." "When said towns are so laid out, each lot on which permanent, substantial and valuable improvements, other than fences, tillage, and temporary houses, have been made, shall be valued by the commission, provided for the nation in which the town is located at the price a fee-simple title to the same would bring in the market at the time the valuation is made, but not to include in such value the improvements thereon. The owner of the improvements on each lot shall have the right to buy one residence

and one business lot at fifty per centum of the appraised value of such improved property, and the remainder of such improved property at sixty-two and one-half per centum of the said market value within sixty days from date of notice served on him that such lot is for sale, and if he purchases the same he shall, within ten days from his purchase, pay into the treasury of the United States one-fourth of the purchase price, and the balance in three equal annual installments, and when the entire sum is paid, shall be entitled to a patent for the same.    If such owner of the improvements on any lot fails within sixty days to purchase and make the first payment on same, such lot, with the improvements thereon, shall be sold at public auction to the highest bidder, under the direction of the aforesaid commission, and the purchaser at such sale shall pay to the owner of the improvements the price for which said lot shall be sold, less sixty-two and one-half per cent. of said appraised value of the lot, and shall pay the sixty-two and one-half per cent. of said appraised value into the United States treasury, under regulations to be established by the Secretary of the Interior, in four installments, as hereinbefore provided.    All lots not so appraised shall be sold from time to time at public auction (after proper advertisement) by the commission for the nation in which the town is located, as may seem for the best interest of the nations and the proper development of each town, the purchase price to be paid in four installments as hereinbefore provided for improved lots.    The commission shall have the right  to reject any bid for such lots which they consider below its value. . All the payments herein provided for shall be made under the direction of the Secretary of the Interior into the United States treasury, a failure of sixty days to make any one payment to be a forfeiture of all payments made and all rights under the contract: provided, that the purchaser of any lot shall have the option of paying the entire price of the lot before the same is due.    No tax shall be assessed by any town government against any town lot unsold by the commission, and no tax

levied against a lot sold, as herein provided, shall constitute a lien on same till the purchase price thereof has been fully paid to the nation. The money paid into the United States treasury for the sale of all town lots shall be for the benefit of the members of the Choctaw and Chickasaw Tribes (freedmen excepted) and at the end of one year from the ratification of this agreement, and at the end of each year thereafter, the funds so accumulated shall be divided and paid to the Choctaws and Chickasaws (freedmen excepted) each member of the two tribes to receive an equal portion thereof."

There is no doubt in my mind, that so long as the Choctaw Nation retains the title to the land in the nation, whether situated within incorporated towns or otherwise, such nation has the right, under the laws of and the treaties with the United States—particularly article 39 of the treaty of 1866—to require that "no person shall expose goods or other articles as a trader without a permit of the legislative authorities of the nation he may propose to trade in," but Choctaw citizens are not required to have such permit. Nor is there any doubt in my mind that until patent shall issue from the Choctaw Nation, conveying the title to lots in the incorporated town site of South McAlester to purchasers thereof under the Atoka agreement, the nation still retains the title therein, unless full payment therefor as provided in said agreement shall have been made. Mere delay in the issue of the patent by the nation would not suffice to continue the title in it, provided all the conditions required of the purchaser under the agreement had been met. But the allegations in the complaint do not show that one single plaintiff named therein either had a patent for his lot in said town site, or was at the date of filing the complaint entitled to a patent, but shows to the contrary. It follows, then, as a matter of course, if my premises are correct, that until patent from the Choctaw Nation has issued, or is at least due by reason of the fulfillment of all conditions re-

quired on the part of the purchaser, that the nation retains the title in these lots, and same are subject to its control, as the other real estate in the nation, and the complaint, on its face, showing that none of plaintiffs have complied with the conditions in the Atoka agreement necessary to invest them with ownership in these lots, and that they are doing business in said Choctaw Nation without having the legislative permit required by article 39, such complaint is vulnerable to demurrer, and the trial court erred in not sustaining the demurrer that said complaint failed to state facts sufficient to constitute a cause of action; and it is for this reason alone that I concur in the judgment of this court in reversing this case.

It ordinarily would be sufficient for one assenting to a judgment to stop after having given the reasons for such assent. But this case is of vast importance, and, as I view the law, the opinion of the court is based not only on a misconstruction of the issues raised by the demurrer, but the reasons assigned in the opinion, if the issues of fact were properly before the court, are insufficient, in my opinion, as a base for the conclusions reached.

If the complaint, in addition to other matters complained of, showed by its allegations that the title to the town site of South McAlester had actually passed from the Choctaw and Chickasaw Nations by unconditional conveyance, or that plaintiffs, as lot holders, had performed all conditions precedent required by the Atoka agreement to entitle them to patent for such lots—a condition which is assumed as a fact in the opinion of the court—I would be compelled to dissent from the conclusions arrived at in such opinion, as the questions to be decided would be altogether different from those properly raised by the demurrer to the complaint. I would then have to decide: First. Whether article 39 of the treaty of 1866 between the United States and the Choctaw Nation had been repealed in so far as related to

incorporated town sites, such as South McAlester. Second. Is South McAlester, under such circumstances, to be considered Indian country, and held to be under the control of the Interior Department, as such? If not to be considered as Indian country, what law would the subagents of the Interior Department have authority to interfere with the business or houses of plaintiffs? Third. Do plaintiffs come within the terms of article 39 of the treaty of 1866 between the United States and Chickasaw Nation as traders? If so: First. Are defendants, as agents of the Interior Department, under article 39 of said treaty, authorized, on failure of plaintiffs to pay the nations such sums as are demanded by it, to close the stores of plaintiffs until such demands are paid? If not: Second. Under what law are defendants assuming to act in attempting to require plaintiffs to pay the demands of the nation against plaintiffs, whether South McAlester comes under the laws prescribed for Indian country or not?

Has article 39 of the treaty of 1866 been repealed, so far as incorporated town sites are concerned? The article is as follows: "Art. 39. No person shall expose goods or other articles for sale as a trader without a permit of the legislative authorities of the nation he may propose to trade in." But Choctaw citizens within the nation are not required to have a permit. Article 39 forbids every person, except Choctaw citizens, from "exposing goods or other articles for sale as a trader in the Choctaw Nation except such person has a permit from the legislative authorities of the nation." Nothing is said in the article which authorizes the nation to make a money charge, in any way, shape, or form, for the privilege of exposing goods for sale in such nation as a trader. The permit evidently contemplated it to be given by the Legislature—that each proposed trader first have a grant from the legislative authorities of the nation before he was authorized to expose goods and other articles for sale therein as a trader. There

is no law of the Choctaw Nation pleaded, and we cannot take judicial notice that there is any law of the Choctaw Nation ,requiring payment of any sum as a condition precedent to exposing goods for sale in said nation as a trader. Sass vs Thomas, 4 Ind. Ter. Rep. 331 (69 S. W. 893); Hockett vs Alston, 3 Ind. Ter. Rep. 432 (58 S. W. 675; Id., 49 C. C. A. 182, 110 Fed. 910); Wilson vs Owens, 1 Ind. Ter. Rep. 163, (38 S. W. 976); Id., 30 C. C. A. 257, 259, 86 Fed. 571.

Where, then, do defendants obtain their authority to demand of the plaintiffs the payment by plaintiffs to the nation of any sum of money for the privilege of exposing goods and other articles for sale in the Choctaw Nation? It does not appear in the case at bar, but, should we waive the consideration of this very vital question, has not article 39 been repealed, so far as town sites duly incorporated under United States laws are concerned?

Perhaps a review of some of the legislation leading up to the present conditions in this section will be appropriate. Slowly at first, but more and more rapidly later on, all of the Five Civilized Tribes permitted the ever encroaching whites to occupy portions of their several nations, thus allowing the barriers of the law isolating each nation to be broken down. The strict rules of an earlier date under the treaties were relaxed, and more and more relaxed by the Indians themselves, until in 1889 Congress found such conditions existing in the Indian Nations composing the Five Civilized Tribes that it was compelled to the act of March 1st of that year, c. 333, 25 Stat. 783, providing for the establishment of a United States Court in Indian Territory, and the enactment of certain general laws for it; in this way dealing with the whole of these tribes as a unit, whereas before they had been dealt with separately by treaty. This was followed by the act of May 2, 1890, c. 182, 26 Stat. 81, enlarging the jurisdiction

of the United States Courts, erecting the territory into judicial divisions without reference to tribes, providing for a complete code of laws for the whole, and enacting that the Constitution of the United States and all general criminal laws of the United States should be in force in the territory.   And section 16 of the act of March 3, 1893, c. 209, 27 Stat. 645, provided for the appointment of a commission (commonly known as the "Dawes Commission") to the Five Civilized Tribes to enter into negotiations with each of them "for the purpose of the extinguishment of the national or tribal title to any lands   *   *   *   now held by any and all of such nations or tribes, either, by cession of the same, or some part thereof to the United States, or by allotment or division of the same in severalty among the Indians of such nations   *   *   *   with a view to such an adjustment   *   *   * to enable the ultimate creation of a state   *   *   *   within said Indian Territory."   On March 1, 1895, Congress again passed a general act providing for additional judges in the territory, made the crime of the introduction of intoxicants committed by Indians punishable in United States Courts, provided for court houses and jails, and a Court of Appeals for Indian Territory, without reference to tribes or tribal lands, dealing with the five nations as a unit; and in the act of June 7, 1897, c. 3, 30 Stat. 85, Congress again enlarged the jurisdiction of the courts, and therein made the Indian who could speak our language liable to service as a juror.   In the act of June 10, 1896, c. 398, 29 Stat. 340, Congress made the following declaration in reference to Indian Territory: "It is hereby declared to be the duty of the United States to establish a government in the Indian Territory which shall rectify the many inequalities and discriminations now existing in said territory, and afford needful protection to the lives and property of all citizens and residents thereof."   On June 28, 1898, pursuing this declaration of the act of June 10, 1896, Congress provided a scheme for the government of the territory in the bill commonly known as the "Curtis Bill," and therein provided for the

creation of municipal corporations, and their government, and for taxation to sustain such governments, and further provided in the Atoka agreement with the Choctaw Nation that said nation should have a commission who should lay out town sites in said nation; that said commission should have prepared correct and proper plats of each town, and file one in the clerk's office of the United States District Court for the district in which the town is located, and one with the Principal Chief or Governor of the nation in which the town is located, and one with the Secretary of the Interior, to be approved by him before the same should take effect, and that said nation could sell and part with the nation's title to property in such town sites, and that, upon full payment of the purchase price by the purchaser of said property, the nation's patent therefor should issue—and in this agreement further provided for the allotment of the lands, and the early extinguishment of the tribal relations and interests, and therein further defined the jurisdiction of the United States Courts. Later, in the act of February 18, 1901, c. 379, 31 Stat. 794, Congress provided for general corporations, and granting corporate charters in Indian Territory. Later, in the act of March 3, 1901, c. 868, 31 Stat. 1447, Congress declared each and every Indian in the Five Civilized Tribes a United States citizen, and in the act of May 19, 1902, c. 716, 32 Stat. 200, made provisions for the creation and payment of municipal bonded indebtedness.

When Congress by the act of May 2, 1890, c. 182, 26 Stat. 81, provided that Mansfield's Digest of the Laws of Arkansas in reference to municipal corporations should obtain in Indian Territory, it made its first attack upon the Choctaw Nation as Indian country, and recognized that white men were here, and legally so, and had gathered themselves into communities sufficient in number to entitle them to be incorporated as towns, and to be in need of a system of municipal government, and entitled to protection in their rights, and made the contracts between the

whites and Indians enforceable in United States Courts.   By the adoption of the Curtis bill, entitled "An act for the protection of the people," Congress dealt with the entire population—Indians and noncitizens—of Indian Territory.   By its adoption of section 14 of that act, it provided expressly for the legal incorporation of towns in Indian Territory, and provided that any person having resided six months in such town site should be considered a citizen thereof, and entitled to vote for the establishment of such town as a municipal corporation, whether such person was an Indian or a noncitizen, and enacted that all citizens owning personal property therein, whether Indian or noncitizen of the tribe in which the town was located, should be liable to taxation to maintain such municipal government, and provided that "the councils of such cities and towns for the support of the same and for schools and other public purposes may provide by ordinance for the assessment, levy and collection annually of a tax upon such property   *   *   *   and for such purposes may also impose a tax upon occupation and privileges."

Here we have a peculiar situation, indeed, if article 39, as to South McAlester is still in force.   A Choctaw citizen is to be regarded and taxed on his property in the town as any other citizen—he may be required to pay an occupation tax or pay for public privileges in the town—yet article 39 specially excepts him from so doing in the Choctaw Nation.   Again, a citizen of the United States pays his taxes to South McAlester for occupation tax or otherwise and yet defendants claim the right to close his store and prevent his pursuing his business or occupation without other authority than a rule of the Secretary of the Interior promulgated primarily to aid in the execution of a penalty, authority for which is abrogated by statute.   And this in view of the fact that in section 29 of the act for the protection of the people of June 28, 1898, c. 517, 30 Stat. 505, it is provided:

"But the provisions of said agreement (the Atoka agreement), if so ratified (by the Choctaw Nation), shall not in any manner affect the provisions of section 14 of this act." That is to say, that said section 14 establishes a new order of things in the town sites in Indian Territory, and the same shall stand, and be given full force and effect in every particular, notwithstanding Congress has made provision for the continuance of the Choctaw government until 1906. All the other provisions of the act only apply to the Choctaws where the same do not conflict with the Atoka agreement. Under the Atoka agreement, when the town commission had prepared the plat of South McAlester, and had filed one in the clerk's office of the United States Court for the Central District, and one with the Principal Chief or Governor of the Choctaw Nation, and one with the Secretary of the Interior, and such town plat was approved by the Secretary of the Interior, the Choctaw Nation by such acts dedicated that portion of said town site designated on such plats as streets, alleys, and parks to the municipal authorities of South McAlester, and relinquished by such dedication all their right, title, and interest in such streets, alleys, and parks to such municipality irrevocably, forever. Davenport vs Buffington, 1 Ind. Ter. 424, 45 S. W. 128; Id., 38 C. C. A. 453, 97 Fed. 234, 46 L. R. A. 377. All jurisdiction of any and every kind whatsoever passed thereby from the Choctaw Nation to the municipal authorities of the town of South McAlester, so far as streets, alleys, and parks were concerned; and such nations and the United States, by such dedication under the Atoka agreement as to such streets, alleys, and parks, have as absolutely repealed article 39 as though they had said so in express terms.

We may say truthfully that although the reason of a law has failed, from changed conditions of society or otherwise, nevertheless the law itself may still be enforced, unless it has in, some way been repealed. True it is again that repeals by impli-

cation should not be favored, but when subsequent acts of legis-
lation affecting the same subject-matter, intended to meet and
satisfy new conditions and needs, are incompatible with the
enforcement of the original law, then does not only the failure of
the reason for such law, but, also, the carrying into effect the
provisions of the later laws, demand that such original law be
held to be inoperative and ineffective; and the fact that this
nation and the United States, in the Atoka agreement, consented
to the segregation of the town site of South McAlester from the
nation, and its erection into a municipal government under
United States laws, and its dedication of the streets, alleys, and
parks in said town site as platted to said municipality, and the
approval thereof by the honorable Secretary of the Interior, and
the further fact, if it be such, that these nations have voluntarily
parted with their title in and to the town site of South McAlester
to plaintiffs and others, show that they have abandoned their
claim to it as Indian country.    Here the reason for the old law
was to protect the Indian on his government reservation from
intrusion on the part of the noncitizen, and to regulate methods
of trading, and to protect the Indian from unscrupulous non-
citizen traders.    It was not a question of raising revenue for the
support of the tribal government at all.    It is questionable
whether the country of the Choctaw and Chickasaw Nations was
ever a government Indian reservation, in the true sense of the
term.    The tribes held these lands by virtue of a United States
patent, and had their governments.    The law of the United
States was over the nations by virtue of treaties, and, so far as
noncitizens were concerned, the United States government was
bound to protect these nations from intrusion by them, or at
least to see that non-citizens coming into the nations came there
in accordance with the laws of the United States and the treaties;
and thus the law requiring the honorable Commissioner of Indian
affairs to remove intruders from Indian reservations, not being.
duly licensed, was held to apply to these nations.    By the Atoka

agreement the Choctaw Nation not only recognized the right of noncitizens to be in the Choctaw Nation, but recognized how such noncitizens might become property holders of the tribal lands situated within town sites of the nation, and in the most solemn manner voluntarily consented that portions of their territory should be detached from the remainder, and should be treated distinctly and separately from such remainder as town sites; and not only did they part with their rights in and to such segregation, but sold and transferred the very thing itself to noncitizens and others without condition. Besides, it must be taken into consideration that the act of Congress forbids the removal of persons lawfully in possession of these lots, which had been the only statutory remedy provided by Congress to prevent noncitizens from exposing goods or other articles for sale in the Choctaw Nation since 1882; and it must be considered, also, that the United States have acquired by condemnation and payment certain lots in said town for a jail site, as the owners in fee. When Congress by treaty in 1889 obtained the Cherokee Outlet from the Cherokee Nation, there was no direct repeal of the authority of the Cherokee Nation over this vast country, and never has been; nor in the treaty of that year with the Creek and Seminole Nations for cession of their holdings in Oklahoma was there any direct repeal of the laws, nor has there ever been, but the treaties and the acts of Congress thereafter are inconsistent with the previous treaties; and, when these nations parted with the title to these portions of their vast domains, they lost all control over them, and the previous treaties and laws became inoperative in them; and there is no difference, in principle, where a town site incorporated under United States law in the Choctaw Nation is concerned, when the nation has parted with its title therein.

The leading case in the United States Supreme Court upon this subject is that of the United States vs .Tynen, 11 Wall. 88,

20 L. Ed. 153, in which the court says: "When there are two acts on the same subject, the rule is to give effect to both, if possible; but, if the two are repugnant in any of their provisions, the latter act, without any repealing clause, operates, to the extent of the repugnancy, as a repeal of the first." U. S. vs Tynen, 11 Wall. 88, 20 L. Ed. 153. The inconsistency and repugnancy between article 39 and the Atoka agreement, and which renders the former inoperative under the latter, arises from the fact that under the former the nation owned and controlled, by government, all lands within its geographical limits, and after its adoption of the latter, as to town sites, the nation no longer owned the lands therein, and had agreed that United States laws controlling municipal corporations should prevail therein, and that Choctaw citizens resident and owning personal property therein should be taxed to maintain government in such United States town sites, and the repeal of the penalty for being in such town sites, and the making of Choctaw citizens United States citizens, made the enforcement of article 39, as to residents of such town sites, absolutely inoperative. The enforcement of article 39 is wholly incompatible with and repugnant to the laws and conditions prevailing in such town sites.

I am constrained to hold that the adoption of the Atoka agreement by the United States and the Choctaw Nation, relating to town sites, and the adoption of sections 14 and 29 of the Curtis bill (chapter 517, 30 Stat. 499, 505), and the carrying into effect of the provisions of said section 14 and of said agreement by sale of the town site to plaintiffs and others, and the repeal of the only statutory penalty for violation of such article 39, as to town sites, are so repugnant and incompatible to the enforcement of article 39 of the treaty of 1866 as to be equivalent to the repeal thereof, so far as the town site of South McAlester and other towns similarly situated are concerned, if we take the fact to be, as to said town sites, that the Choctaw Nation no longer has

title.    Black on Interpretation of Laws, 114; Bates vs Clark, 95
U. S. 206, 24 L. Ed. 471; Sutherland on Statutory Construction,
§§ 138, 145, 146.

Is South McAlester longer to be considered as Indian
country, the Choctaw Nation having parted with its title therein?
Under the Atoka agreement, it is questionable, at least, whether
the Choctaw Nation has not absolutely and in terms surrendered
its jurisdiction and control over South McAlester, and towns in
its nation similarly situated, after segregation, platting, apprais-
ing, filing its plat, and approval thereof, by the honorable Secre-
tary of the Interior, and sale of the lots in the town site, whether
the purchase price has been paid in full or not.    All that remains
for the Choctaw Nation to do in the matter is to issue its patents
and receive its pay from the United States.    The nation can by
no process of law recover the segregated lands.    If the first pur-
chasers default in payment, the lots are to be resold.

It is a matter of notoriety that, at the time of the filing of
this complaint, South McAlester was a city of four or five thous-
and inhabitants, situated in a  populous  region, surrounded on
all sides by mining and manufacturing industries, with two great
railway systems centering the town, with graded streets and
sidewalks, and hundreds of business houses and residences—some
of the business houses, of large dimensions, and carrying im-
mense stocks of goods, valued at many thousands of dollars, with
electric lights, telephone systems, and motor car systems, with
great educational institutions maintained from the municipal
taxes, with many churches, hospitals, and with all the modern
civilized appliances, necessities, and comforts pertaining to the
most progressive, cultured, and refined communities in the
United States.    Its population and the population surrounding
it were mostly white, and, with its population in this condition,
and with the Indian Nation and the United States by treaty hav-

ing invited noncitizens there, and having voluntarily sold and conveyed the fee of its lands in such town site, can it be said that the territory embraced in the boundaries of this municipal corporation and the lands and parcels of land incorporated into such town site under the United States law was Indian country?

In Maxey vs Wright, 3 Ind. Ter. Rep. 243, (54 S. W. 807), decided January, 1900, this court recognized the probability in the future of the very condition we are now considering, and decided that case with the understanding that the Creek Nation had not parted with its title to the lands embraced in town sites, and reserved the right to decide what the effect would be when the Indian title to lands in incorporated towns was determined, as follows: "Nor does the fact that Congress, by the provision of the Curtis bill, has provided for the creation of cities and towns in this nation, and the extinguishment of the Indian title to the lands embraced within the limits of such municipal corporations, alter the case, because this provision of that act has not yet been carried into effect. The Indian title to such lands still remains in them, and it is their country. What effect the provision of this stated rule to cities and towns, when fully consummated, may have, we do not now decide."

I cannot conceive that a statute or a rule enacted or promulgated primarily to protect Indians upon Indian reservations can be held to apply to the above situation. On the contrary, the United States citizen, owning the fee in lots in the town of South McAlester, acquired legally from the Indian nation, without conditions in his deed of conveyance, or without a condition in the treaty authorizing the conveyance, must be held to have every constitutional right under United States law, and to be entitled to protection in his life, liberty, and property. Nor can he be divested thereof, or injured therein, except by due process

of law.    Can it be said that because the Choctaw and Chickasaw Nations once  owned this town site, and the honorable secretary and his subofficers then had authority for the nations to exact payment of a permit fee from noncitizens doing business in such nations, such authority shall be continued and such exaction required after the nations have voluntarily thrown down the bars of their country, segregated portions thereof for town sites, and invited non-citizens to buy and pay for their lands?    I think not. Bates vs Clark, 95 U. S. 206, 24 L. Ed. 471.

If South McAlester is no longer Indian country, and article 39 of the treaty of 1866, supra, has become inoperative as to it and town sites in the Choctaw Nation similarly situated, under what law are the defendants presuming to act, in threatening to close the stores of plaintiffs if they do not pay the demands of the Choctaw nation?    Under said article 39, as we have seen, the law requiring the Commissioner of Indian Affairs, with the approval of Secretary of the Interior (section 2149, Rev. St.), to remove persons detrimental to the peace and welfare of the Indians was held to apply to the Choctaw Nation, and after the act of July 31, 1882 (1 Supp. Rev. St. (2d Ed.) 362), this was the only statutory remedy for violation of said article 39.    But in the act of May 27, 1902, 32 Stat. 259, this remedy was taken away as to citizens of town sites in lawful possession of any lots or parcels of land, and plaintiffs bring themselves within the protecting folds of this statute.

Whence, then, comes the authority of defendants to require plaintiffs to pay any sum to the Choctaw Nation for any purpose, or where the authority of defendants to close the stores of plaintiffs until the demands of the nation are met?    Clause 2 of defendants' demurrer says that the authority under which defendants have acted in doing the things complained of comes from certain "letters" and "communications" attached as ex-

hibits. These letters and communications have been herein before fully set out—and I will but refer to them. Certainly defendants cannot act legally in closing the stores of plaintiffs unless there is some law authorizing them to act. Merely because the United States Indian inspector wrote a letter to the United States Indian agent, advising him of the ruling of the honorable Secretary of the Interior that stores should be closed for non-compliance with tribal laws, and that the United States Indian agent wrote to the United States Indian inspector, instructing him to personally notify plaintiffs that the Principal Chief of the Choctaw Nation had reported plaintiffs as having failed to pay the tribal tax, and a further letter from said inspector to said agent, transmitting a report of the Principal Chief that plaintiffs still refused to pay the tax demanded, and instructing said agent to close the places of business of plaintiffs unless said tax was paid, and a copy of the order of said agent to the captain of Indian police, directing him to close plaintiffs' places of business, with a copy of the notice served by the agent on plaintiffs, does not make a law, nor can such action be taken unless behind the rule of the honorable Secretary, referred to, there is some law of the United States authorizing such rule.

The penalty for coming into the nation and doing business therein without paying the permit tax or fee was removal of the person from the nation, as objectionable, until the act of Congress approved on May 27, 1902, in which the Secretary of the Interior is forbidden to remove any person from the Indian Territory, who is in lawful possession of any lot or parcel of land in any town or city of the Indian Territory which has been designated as a town site under existing laws and treaties; and, except as the closing of a store is but the method under a rule promulgated by the honorable Secretary for preventing a violation of the treaty— that is, stopping the unlawful act of trading without complying with the terms of the treaty—there is now no specific provision

of law providing what penalty shall be visited upon the unlicensed trader in the town sites in the Choctaw or Chickasaw Nations, and the defendants, acting as subofficers, have followed the rules prescribed by the honorable Secretary.

I think that the honorable Secretary has fairly stated the meaning of the law in this rule, provided he has the power to act at all; but, before he can act, the conditions must be such as are covered by the law under which this rule was promulgated. The honorable Secretary's rules providing for the closing of stores must not only be based upon the law, but can only be exercised in Indian country. His rules must be such as conform to the penalties prescribed by the law itself. Here the penalties prescribed by the law are repealed as to noncitizens lawfully in possession of town lots in the town sites in the Choctaw Nation. If the penalty of the law is repealed, then, as the greater includes the less, the rule promulgated to enforce the penalty must fall, and be nugatory and of no effect. Complainants bring themselves clearly within the class of persons against whom the honorable Secretary is prohibited from removing from the territory, and he cannot prescribe some other method, and do indirectly that which the law says he must not do directly. Where the Choctaw Nation, by treaty, has solemnly agreed to the segregation of town sites within their nation, and by deed of conveyance have sold and conveyed such segregations to noncitizens and others, without conditions, such town site segregation, in my judgment, cannot be longer considered as Indian country; and the treaty and acts of Congress providing for such segregations, and the erection of town sites and municipal incorporations, and the sale of town lots therein to noncitizens, make article 39 of the treaty of 1866 as ineffective and inoperative as though the same had been repealed in express terms, so far as town sites are concerned.

But do plaintiffs come within the provisions of said article 39, as traders? Article 39 forbids every person, except Choctaw and Chickasaw citizens, from exposing goods or other articles for sale as a trader in the Choctaw and Chickasaw Nations, except such person has a permit from the legislative authorities of the nation. Let us see what was meant by the expression, "No person shall expose goods or other articles for sale as a trader." In their primitive state, and for many years later, it was the custom of the whites to take a pack or load, a wagon or a wagon train, of goods or other articles, into the Indian country, and trade such goods and articles, not for money, for the Indian had none at first, but for hides, horses, and the peculiar possession of the Indians, and such persons were designated "Indian traders;" and the term survived even after the advent of railroads, and the establishment of permanent posts for trading, and the term "traders' posts" is not infrequent in our legislation. The Choctaw and Chickasaw Indians, sadly imposed upon by these traders, found it necessary to ask the protection of the government, and so we have the article 39, above.

Can it be said that persons living in the towns authorized by the laws of the United States, owning the lands on which their places for business stands—permanent places for handling their merchandise—are traders, in the sense of this article 39? Common sense would at once say, "No!" Do these merchants, some of whom, from their names, are great wholesale corporations, whose operations are probably not confined to the Indian Territory, but reach out into adjoining states and territories, come under the appellation of traders contemplated in article 39? Most assuredly no! But the government of the United States, in superintending the operations of noncitizen merchants within the Five Civilized Nations, has treated this law as including them within its terms, so long as they were doing business in the Indian country; and, where such merchants have sought to do business

without complying with the conditions imposed by the Indians themselves, the United States authorities have removed such merchants from the Indian country. By the act of June 7, 1897, as well as the acts of March 1, 1889, and May 2, 1890, the Constitution of the United States, and laws thereunder, are put absolutely in force in Indian Territory without reference to the Indians. By the Atoka agreement (Act June 28, 1898) it is provided, as to town sites, that the nations may part with title to town lots, and that the owners of the improvements, without reference to whether they be United States citizens or Choctaw or Chickasaw citizens, shall, under certain conditions, have the right to purchase and acquire the title to such lot or lots, and that lots may be sold at public auction to any one, without reference to whether they are Choctaw or Chickasaw Indians, or otherwise, and that the money obtained for sale of town lots shall be for the benefit of the members of Choctaw and Chickasaw tribes, excepting the freedmen. Article 5 of the amendment to the Constitution of the United States provides, among other things: "No person shall be   *   *   *   deprived of life, liberty or property without due process of law." Has the Choctaw Nation jurisdiction to enact laws for United States citizens within town sites incorporated under United States laws and treaties of the nation, in reference to how they shall use real estate sold by such nation to such citizens? Or to impose other conditions than those named in the treaty, upon which such United States citizens may or may not be permitted to use lands which such United States citizens hold in fee? I think that both of these questions, under the law, and under the constitutional provision above mentioned, have to be answered in the negative. If the Choctaw Nation and the United States had intended to reserve to said nation its jurisdiction over South McAlester, and other towns in its nation similarly situated, they could easily have so stated therein; but, instead of doing so, they agreed to change, and did change, the nation's entire interest, management, and control of

such town sites; and the nation must accept the consequences of such change, and can no longer exact as their due what they have voluntarily yielded.

But it is urged at this point that in the Atoka agreement was reserved the right still to say to noncitizens coming within the boundaries of the nation, even though such noncitizens lived in the town sites under the laws of the United States, and were allowed, as citizens thereof, to participate in municipal government and tax themselves therefor, and although such citizens should acquire and pay for the fee of the lots on which they lived, and on which they might erect business houses, that the nation still claimed the right to require such citizens, before transacting business therein, to pay a license or permit fee for the transaction of such business. If we analyze the sections of the Atoka agreement referred to by appellant, we will find that no such reservation is intended. Let us see. Atoka Agreement, § 57x35 (Ind. Ter. St. 1899, p. 41): "That no law or ordinance shall be passed by any town which interferes with the enforcement of, or is in conflict with the laws of the United States, in force in said territory, and all persons in such towns shall be subject to said laws." In my judgment, the construction to be given to this section must be that "all persons in such towns shall be subject to said laws" refers to the laws and ordinances of the towns, which laws and ordinances must not interfere with the laws of the United States; and certainly, as heretofore shown, the provisions of section 14 of the Curtis bill are expressly excepted from any reservations whatever in the provisions of said Atoka agreement; See last clause of section 29 of the Curtis bill (Ind. Ter. St. 1899, 57x19). While there has never been any express repeal of article 39 of the treaty of 1866, the acts of Congress and the Atoka agreement have been inimical to and incompatible with the enforcement of article 39 in incorporated towns in the Choctaw Nation, and the fact that the nation consented to the segregation of, and

has voluntarily parted with the title in and to, the town site of South McAlester, shows that said nation has abandoned claim to it as Indian country; and the Constitution and laws of the United States, having attached thereto, no longer can the nation impose conditions for its occupation and use, because it voluntarily and in the most solemn manner (that is, by treaty and deed, and for valuable consideration) has yielded possession thereto without conditions.

Congress and the Choctaw Nation itself provided for the extinguishment of the Indian title in incorporated towns in the Choctaw Nation. Congress threw over every citizen in such nation the protecting folds of the Constitution of the United States. It provided for the forum in which all rights of United States citizens legally within the Choctaw Nation should be tested. Any other way of divesting the right of United States citizens legally within the Choctaw Nation, than as provided by law in the forum established by law, is without due process of law, and cannot be upheld. I am of opinion, if the premises of the opinion of the majority of the court be accepted, that, as to United States citizens legally within the incorporated town of South McAlester, and transacting business there, the Choctaw Nation having parted with its title thereto, such nation has voluntarily parted with the right to further continue exaction from such citizens in the way of a permit tax or license fee, and that, the nation no longer having this power or right, the honorable Secretary and his subofficers, in threatening to close the stores of such merchants, are not acting under due process of law, and should be restrained, and the decision of the lower court restraining such officers should be affirmed.